1-23-16-94, Ellen Judt for the insurance company's disbursement hearing. Good morning, counsel. Good morning. Before we start, just a couple of things. One, we're going to watch. Twenty minutes aside, the appellant will have an additional five minutes. After that twenty minutes, you don't have to reserve anything for rebuttal. And the second thing is just to keep your voices up nice and loud. This microphone records, but it does not amplify in any way. So with that, whenever the appellant is ready to begin, you may begin. Thank you. May it please the court, my name is Greg Harris, and this is my co-counsel, Richard Craig. And we represent the appellants, Ellen and her parents, Jeff and Mary Beard. At issue today is whether underinsured motorist coverage applies for a young woman who suffered horrific injuries in an automobile accident while living with her parents. In this case, representing them, we immediately knew with the injuries that we would need as much insurance coverage as possible. We contacted the defendant, Economy, and wrote them a letter requesting coverage and requesting confirmation of that coverage. Specifically, we asked, please consider this letter a formal request for coverage. We wrote, this is written notification of a claim for such coverage. We asked for certified copies and the declarations. Are you going towards Waver and Estoppel? Is that where you're heading? Not yet. Okay. You're just trying to give us the facts. We have read the briefs and we are aware of the background facts. Okay. The only other point in the letter that I really want to make sure, because in the appellee's brief it was not fully set out, is they did say, quote, we provide automobile insurance coverage. So what happened is they wrote the letter, we settled the case for a nominal amount with the at-fault driver's insurance for $50,000, and then we proceeded to attempt to get the underinsured coverage, and that is the moment where they reversed positions. This court should not allow them to reverse positions and deny coverage after they wrote the letter, we settled the case, and now they change their opinion. For two reasons they shouldn't be allowed to do that. Number one, they were right in their initial letter that there is coverage according to the policy, regardless of the waiver or the estoppel argument. Number two, of course, there's the waiver and estoppel argument. That's a second reason they should not be allowed to reduce or to stop the coverage, to take it back. I know you read the briefs, but quickly on the insurance policies, just to make sure we're all clear. The at-fault torque-feasor had a $50,000 policy, paid it. Ellen Beard had a policy with $250,000 in underinsured. Economy paid that, and that's the set-off. The third policy, we're going to call it auto policy number two, as I referred to in the briefs. That is the policy for $500,000 underinsured coverage. Ellen Beard was a named household driver on that policy. That is the policy for which they're denying coverage, the first policy they're denying coverage. The next policy is the personal excess liability coverage for $1 million. This is the one referred to in the letter as well. And this one, Ellen Beard is also a named household driver, and she's actually a rated driver on that policy, and Economy is also denying coverage under that policy. So let's start with the auto policy two, which is the $500,000 underinsured policy. And we look, is she covered under the exact language of the policy? The policy defines the insured under the underinsured portion, which is obviously what we're here for, as you or any relative. So now we look, obviously she's a relative. She's the blood daughter living with her parents. But they define relative, and they say it means other than you. who is a resident of your household and is related to you by blood. That's one definition. They give it a second definition. It also includes your children that are residents of your household who are living elsewhere. So basically there's two ways in this case that the auto policy would apply because Ellen Beard is a relative. It's significant, by the way, that the term resident is never defined in the policy at all. So the two reasons that they're denying coverage are that they say she's not a resident and they say exclusion G. So we get that. So let's get to those, okay? Okay. She is a resident, clearly. First of all, the standard, everything construed liberally towards residents, towards coverage. You look at the time of the accident. It's undisputed. She's the daughter listed as a household driver. The address on a driver's license. It's very clear because there's a very fine trial judge, who's now one of our colleagues here at the appellate court, who disagreed with me in a pretty detailed opinion. But we're not afraid of her. No, we're not at all. So I don't know that it's all that clear. I did see her picture on the wall out there as I walked in, which was very nice. But it is clear because I think what Judge Gamert looked at was this intent, as economy brought up. But the problem with looking at intent is that it's intent at the time of the accident, not intent at some point later down the road. Well, her intent was clearly to leave her parents' house, right? She had taken a job in the loop, or was taking a job in the loop. She signed a lease in an apartment in the city. I think she even notified the company of her new address. Yes, her intent, because her company had moved, was to follow the company to Chicago after the accident. Not knowing there was an accident, but to give it a month. The accident was October. Her intent was to move in November or December. And that's clear based on everything we have. Her toiletries, her cosmetics, her bed, her furniture, clothes, everything was to go to her mom's and dad's home at the time of the accident. Not everything, though. A couple items were at the future residence, a couple items. A mattress. A mattress on the floor. Mattress. Very few items. And, in fact, this is all uncontradicted. She spent all her nights at the home with her parents. Not all nights, though. You keep using this term, all, and the record doesn't support that. Okay. I agree with that, and I should not use all. The point I'm making is that, not to put an exact percentage on it, but basically she did everything that you would need to do at her parents' home, spent a couple nights here and there at the apartment bringing down a few items, had not hired a moving truck. She signed a lease because it was a tough market. She wanted to make sure she had a place. But the intent was not to move. The company hadn't even moved yet. She certainly wasn't going to move before the company. For example, if I – and let's not forget the fact, there's no dispute that her parents' home is her permanent residence unless we find that it was taken away and snatched up by her intent to move at a future date. So that's the equivalent of if I have a home and I decide I'm going to put my home up for sale and move to Colorado, my home doesn't cease to be my permanent residence the day that I decide to put my home up because I have this intent to move later. Similarly, college kids that live at home, they've got a job lined up for after they graduate. They know they're going to move when they graduate and get their job, but their permanent residence is still there until they do it. So at what point – I'm just curious. At what point in this continuum does the residence shift? So is that just intent? We have to have intent plus physical presence. How much is it when she moves half her stuff to the new place? Is that the tipping point? I think that there's a number of tipping points. One would be when the company actually moves there, so she's going to move there. Number two, when she starts sleeping there on a regular basis, perhaps all the time, or at least on a regular basis, when she has all her necessities there on a regular basis. But this wasn't even close. This was a couple items were there, and she spent a couple nights there. This wasn't even – in all the cases that are cited by the defendant on these residency cases, the difference is that in those cases, the person was situated or moved into some temporary residence. Right. On that, I think you're right. And those were cases that the trial judge brought up. And in our case, she's at a permanent residence, and they're trying to – her permanent residence is a place she's never slept in for consecutive nights over and over, doesn't have most of her items there. They're trying to transform her permanent residence into something she's never really used. The law, I think, does say there has to be a physical move, but going back to Justice Mitchell's question, when does that move occur? How do you say – because we all tend to move gradually. Certainly if you have a parent's house to leave stuff at. When does that move occur? How do we know that move occurred? Maybe this is a summary judgment. Maybe there's issues of fact here, whether there'd been a physical move. But how do we know when that is? Well, I think it's a combination of things. One is when a majority, if not all, of your items of daily living, your clothes, your dresser, your contact lens solution, your medications, are all in the new place. So not just yourself, but your items you need on a day-to-day basis is one factor. One is the presence of being there a majority of the time, four, five, six days a week, not a few days over the course of three months, two months, or whenever she signed the lease, just to get the apartment ready. So I think there's certainly not a rule of law. You need five days or this day. But clearly, whatever it is, she didn't come close to being a regular occurrence at this new residence. And abandoning her old residence as well. Correct. So how is this more than just self-serving testimony? One could say, of course. She wants to collect on this policy. She's going to say, no, I haven't really spent any time there, maybe one or two nights. What else do we have to go on to verify that this is the case? Everyone could make these claims. True. And I'm smiling a little bit because it's crazy to say, but she said all that on the roof. It's also uncontradicted. There's no evidence that the company was set up. The defendant has brought forth nothing to show the company was even in existence. All her receipts, which is a documentary evidence that we produced, show her gas receipts, her Facebook posts of pictures, are all occurring in the suburbs by Wadsworth in this time right before the accident, as opposed to anything in Chicago. So she's getting her gas, her groceries, and her days out all in that area, which is just more support to her living with her parents. And, again, it's uncontradicted. How would they contradict that? How would they be able to contradict that? I suppose they could have asked for subpoenaed her receipts to see if she got gas in the city. They could have got the records of the corporation to see when they opened up her company, to see when they opened up downtown. They could have asked who her friends were that she had been with and taken their depositions. But wherever they could have done it, it's uncontradicted. And I think it's uncontradicted because they knew that was the truth, and they were trying to just say it doesn't matter because she signed this lease. Well, even if you're right about that on this issue, you still have the problem of exclusion G, which was another point you lost before Judge Gambra. Can you address that? What, did you want me to do that too? Yes. Exclusion G. You have to run the show for these. I get that. So exclusion G. Exclusion G in short, just to really hammer this home, she's a permanent resident of her household. She's covered on this before she gets her own policy. She's covered under both the auto number two and the umbrella. And then she goes and buys more insurance for the economy, and they take away. Because she buys the car. That's why she buys the more insurance. It's not she's just like, oh, I think I'm going to have another policy. She owns a car. She owns a car. And the purpose of underinsured motorist coverage is to put you in the same position you could be in if the other driver had enough insurance. If she's covered under the liability portion, which nobody disputes if she's assuming she's a resident. And we get by that. She's covered under the liability portion. They cannot take away underinsured motorist coverage with some exclusion that is just very, very, very broad on taking away her rights. If you read her exclusion of the way they have it written, that would mean it would lead to absurd results. Well, that's a hypothetical, right? The way exclusion G actually applies or operates in this case doesn't fall directly within the statute, right? This language in Section 143A. It does not fall under the statute, and here's why. The statute is very, very specific in that the statute allows this exclusion if you're occupying another car that you own that's not in this policy. Occupying that car, okay? And why is that not exactly what happened? She's occupying her own car that is not a car specifically listed in the policy. I'm not saying at this point that that's similar to what happened. What I'm saying is that's not what the policy is excluding for. What their policy is excluding. Right, it's broader than that. I agree with you. She could be in her father's car, and under this language, she'd be excluded. But in this case, she was in her own car. You hit on that, that she could be in her father's car, an insured Colorado, and she'd be excluded because she bought some insurance on this other car. She could be walking down the street as a pedestrian. She's excluded. So she's excluded, and that violates the public policy of underinsured motorists that she should be covered when she's covered under liability. But this is a real question, not a rhetorical question. Do we look to the language of the exclusion, or do we look to the fact that coverage was denied under these facts in this case? I think you look to the language of their exclusion. Did they comply with what is allowed? They didn't. What they're asking you to do is rewrite their policy, which in underinsured coverage where we're trying to lean towards coverage, lean towards the insured, all the presumptions go that way. We're not in a position to rewrite their policy to make it apply so that there's an exclusion. If they would have written this policy according to the statute, I think they'd have a better leg to stand on. But they did not write this policy. They made it super, super broad. What's to prevent every insurance company from saying in exclusion, gee, we exclude everything possible? And then we go back and say, well, this particular fact pattern happened, so therefore it's excluded. They're asking you to rewrite the policy, and I don't believe that's proper. Do you have a case? I do not have a case with me on specifically rewriting the policy, but I'm very confident that when dealing with exclusions where a comma means a difference or a parenthesis or a bold, there are plenty of cases on the language that we can't extend it. We've got to read it specifically, otherwise it's ambiguous. It doesn't apply. So if I'm just to make sure I understand you, you're saying this exclusion is improper, it doesn't follow the statute, so they can't rely on this exclusion, even if they could have written an exclusion that would apply here and would comport with the statute. They can't rely on this one because it's too broad and it does not comport with the statute. I think that's fair, generally, that that exclusion would basically be nullified, stricter. So then do they have another exclusion that they can use? They don't. And I do see I'm running out of time a little bit, so if I could just get to the waiver and estoppel. Is there anything? Anything more about Chief? No. With respect to the waiver and estoppel, I did, you know, waiver focuses obviously on what they did. And estoppel, we had to rely on it, which we did. Again, the standards go in our favor. We don't need strong proof of the waiver. But in their letter and in their brief, they say, well, we were just saying what their limits were. That was all. And they quoted part of their letter. I'm going to ask you a question on waiver and estoppel that I don't think is addressed in your brief. But I think the law is pretty clear that you cannot create coverage out of waiver or estoppel. You can lose a defense to coverage, but you can't create coverage. So what's your response to that? If there's no coverage, how does waiver and estoppel help you? I think what that argument means, and the defendant, you know, raised that in their brief, is that that would be creating coverage would be where you're trying to create a $5 million in coverage when the policy has a $1 million limit. That would be creating. If the policy says you're not covered, then you're creating coverage through waiver and estoppel. Like, you can use waiver and estoppel to overcome a defense, like you waited too long to let the insurance company know that's a defense to coverage. But you can't create coverage. And, honestly, I find this line confusing, so I'm asking.  I'm going to respectfully disagree with that. Okay. You can. Because, again, you know, the policy is written. The declaration page says there's $1 million, and here's all the terms, et cetera. And they write a letter, hypothetically, and the insurance company writes a letter that says, you have $5 million in coverage. That's creating coverage that was never there, never intended to cover any type of loss. That's exactly. But not creating coverage is if they write a letter saying there's $1 million in coverage, but you have all these policy defenses and reasons that it shouldn't be covered. That's not creating coverage where there's not. The case that we just said is almost exactly on point, Burke. In State Farm v. Burke, the defendant argued exactly that point, that they're trying to create coverage where it doesn't exist because the insured wrote a letter saying, we provide this coverage. And there were defenses, I believe statute of limitations defense and some other real defenses. And what the court said is it's not creating coverage that doesn't exist because the limit is the limit, and that's what they decided they were going to insure for if there's coverage. So not only does the Burke case stand for the proposition, it's not creating coverage, even though you have these policy defenses where it may not apply, it also is very strong on the point of, it was a waiver in that case, where they used the words, they are, I believe they used the words, they are granting coverage. And in our case, the county said, we provide coverage. So almost identical wording, and the court in Burke said, number one, it's a waiver, and number two, they refuted the argument that it's not creating coverage. That's State Farm v. Burke. We have it as 2016, the last second, 150462. Yeah, that's in your brief. All right. Just in conclusion only, is there any more on the waiver? In conclusion, the only thing that we need to be clear on, as you stated in the beginning, one way to get coverage here is we've got the residents and we get by the exclusion. A second or third way, depending on if you combine it or not, is waiver and estoppel. They're each separate. Either one can work, and I didn't say anything about the reliance, but the reliance was fairly reasonable when we settled with the tort accuser and released him after being told that there was this million-dollar felt policy. Thank you very much. Thank you. Thank you. Good morning. Good morning. Gary Buhl on behalf of Defendants. There's a couple companies, it's Economy and Metropolitan. They're both MetLife companies. So I will generally refer to them as MetLife. May it please the Court, both in counsel, as counsel indicated, we're here on a UIM case, one of the exciting fields of law. There's two issues, as your honors have pinpointed. One is the question of Ellen's residence in terms of whether she's insured under her parents' policy, and the second is the application of the exclusion and waiver and estoppel. I'm sorry? And waiver and estoppel. Correct. Correct. I meant issues under the policy. So I just want to discuss originally or initially a couple of the points that counsel just made. When you're looking to the issue of residence, the law says that you look to more than physical presence, you look to intention. And you look to the question of whether there is an intention to make that location your permanent abode. But you do not dispute that she was at one point a resident of her parents' house. Correct. Okay. So then she has to abandon that residence before she can take on a new residence. I believe you have to have an affirmative abandonment. I think the law is pretty clear that you do. Well, I disagree with that. Use that word. You have to abandon the residence before you can take on a new residence. I think you can have more than one residence, but for each residence, you have to have an intention for that to be your permanent abode. I woke up yesterday. It was a cloudy, gloomy day, and I thought. And you wanted to go to Florida, right? I wanted to go to this apartment. I'm so sick of it. I'm going to list it for sale. So I no longer have an intent to remain there permanently. Yet I haven't acquired a new residence, right? Correct me, Dave. So there's no physical presence and intent. And I believe that she's taken affirmative steps to obtain her permanent residence. She rented the apartment. She got an insurance policy on that apartment. She changed her auto insurance for that apartment. She started to move her goods. This is not a thought where all of a sudden she says, Well, you know what? I'm going to move out. This is a situation where there was a number of affirmative steps. And she expressed her intention that her permanent abode would be on Y Street in Chicago. But she wasn't staying there consistently, right? She stayed there a couple nights. But her intention was to stay there permanently. You have intent, but you don't have physical presence. You have to have both. I don't believe you need both. No, I think the case law looks to the question of intention as the relevant factor. A relevant factor. I don't know what primary factor means if you have multi-factors, right? I mean, if you have to have two. That's neither here nor there, I guess. And again, we're not disputing that she still had items at her parents' house and she was still sleeping there. There's no question of that. Is it when she signed the lease? I'm not sure it's necessarily that. I think it's that in combination with every other step. And her expressed intention that she was no longer considering her parents' home to be her permanent abode. She was making her Y Street apartment her permanent abode. When did she expressly state that she no longer considered her parents' residence to be her permanent abode? She testified that she intended to make the Y Street her permanent abode. Okay. So, again, you know, I definitely don't think she's a relative resident at the time of the loss based on her intention. But that fact is irrelevant because even if she's an insured, there's still no coverage under the policy based upon the exclusion. And can you speak to the point that counsel made, which is the way the exclusion is worded does not comport with the statute? Yeah, I disagree with that. The exclusion provides we do not cover a relative who owns, leases, or has available for their regular use an auto, which is insured for uninsured motorist coverage or underinsured motorist coverage on a primary basis under any other policy. And that would apply whether she's in her father's car or in one car, correct? Well, there's another exclusion, which we didn't raise because I think it falls squarely within this one, which talks about we do not cover, where is it? It is exclusion under the endorsement. We do not cover any person occupying or struck by a motor vehicle owned by you or a relative other than a covered auto. So the key on these is it's got to be, and let me read the statute. Okay. This is so clear, the statute. The statute provides uninsured motorist coverage does not apply to bodily injury, sickness, disease, or death resulting therefrom of an insured while occupying a motor vehicle owned by the insured, a resident spouse, or a resident relative, if that motor vehicle is not described in the policy under which a claim is made. So it's not just limited to, ours is limited to one owned by a relative, but the statute is even broader. If it's an owned vehicle by the father and it's not covered under that policy, that policy doesn't apply.  The intention of the statute was to make sure that an insurance company wasn't providing insurance on a vehicle that they weren't covering. Right. Right. So the exclusion within the statute would not exclude her father's car because her father's car is described in the policy. Correct. But your exclusion would apply to her, to her, if she's driving her father's car or her own car. Because what it's looking to is that she would have primary underinsured motorist coverage under her own policy. Again, it's not taking away, it's reflecting on the fact that there's other primary insurance under a purchase policy. The other point I want to discuss, and counsel began to reference it in his argument this morning, is there's no evidence that Ellen Beard was on their policies prior to the time of the loss. They made that argument in the underlying court. She obtained her policy of insurance on her own vehicle years before this loss. There's documentation in the file. I'm not sure why any of that matters. Because he makes these arguments that on one day she's covered as an insured under both of these policies when she's not been covered under these policies for years. Okay. So what? She either is or she isn't. And whether she lost that coverage a year ago or yesterday doesn't really matter. I'm just not, I'm not sure why it matters. Because he makes the argument that she purchased this insurance. Right. And that she's worse off for having purchased this insurance. Right. That's not accurate. She purchased her own policies. In order to cover her car. Correct. And she had different cars. She lived at different locations. And copies of the documentation from MetLife in the file is on that. Okay. So he's got a whole argument in his brain. I know. I know. Well, Judge Gammell noted that during her argument and told him. And then in her order you'll see she says that his client's testimony is not consistent with that because it is not. She admitted that she had purchased her own car a number of years after that. The other point I want to dispute is this whole, you know, I don't believe that our exclusion violates the public policy. I believe that it is exactly expressly authorized by the statute. It's providing that there's no coverage where the insured in her vehicle is covered by another policy. So at least it's how the, your Exclusion G operates in this case. It is consistent with the language of 143. Correct.  And, you know, I believe that it would even be consistent with the statute even if she is in her father's car. Because it talks about, the statute talks about when there's coverage under another policy or a vehicle owned by even the named insurer or relative. No, because the statute excludes, the exclusion within the statute excludes any situation in which that motor vehicle is described in the policy. I mean, I think the statute, which is not clear on anything, but I think it's pretty clear that it only applies if that motor vehicle is not described in the policy. Correct. And her father's vehicle is described in the policy. Correct. But I believe that, okay, the statute says, oh, okay, I see where you're going. Okay. From the insured, because it could be a vehicle owned by the named insurer but not described under the policy.  But again, in its application here, it's only. In its application here, it's consistent with the statute. Correct. Because this was not a vehicle described in the policy. Correct. And again, if we were dealing with a vehicle not owned by an insured, the other exclusion would apply. We don't cover any person occupying or struck by a motor vehicle owned by you or a relative other than a covered item. Again, the intention is to limit the coverage under the policy. So I go back to my original question, which I asked counsel, is that, I mean, I think he's got a point that the exclusion as written in this policy is not consistent with the statute. It's consistent in this application, but not, it could be applied to something that is not consistent with the statute and is arguably against public policy. Do we apply, does that make it okay to rely on it? Yeah, I believe so, because it does not violate public policy. As applied here. Correct. But on its face, it's public policy. It satisfies the public policy that you're not getting insurance under a policy that you weren't paid to have coverage for, for her vehicle. She bought her own policy. I get that. And the other point is, you know, the whole question of if it violates public policy, it violates public policy because it's taking UIM coverage away from an insured under the policy. Counsel indicated we don't dispute that she would be an insured for liability purposes, but she would not be an insured for liability purposes. Because the insured under the liability coverage is two-pronged. One is with respect to a covered auto, which is defined as the autos described in the policy, and they extend coverage to you, the named insured, and a relative. It's not a covered auto, so that one doesn't apply. The second provision deals with coverage for a non-owned auto. Non-owned auto cannot be an auto owned by an insured under the policy. So she owns that vehicle, so there's no liability or UIM coverage for her. Correct. There's no violation of taking UIM coverage away from an insured, which is the whole public policy. So she still wouldn't have coverage. Only because she's not in her father's car. She's in her own car. Correct. Correct. Now, you know, even if she had moved, had lived there for 12 years and she was in her father's car, she'd have coverage under the liability portion of it. And the UIM. And the UIM. Now, with respect to this children living elsewhere, when you look to the definition, you still have to be a resident. You know, she still has to be a resident of her household. Children living elsewhere deals with situations like kids away at college, where you have dual residences. When they go away to college, they don't have the intent to permanently stay at college, hopefully. They often abandon their parents' residence. They never do. I know. There's many things in this case I can relate to. And they're not arguing that she's living somewhere else either. So, you know, I don't know where they're going with that one. The waiver on estoppel, I think when you look to the demand number one, they make a demand under Ellen's policy. And then they're seeking information regarding the other policies maintained by the Beards. Is it the best verbiage Sarah Reeder could have written? Maybe not. But she testified that her intention was to describe the limits of liability. That's all she said. She didn't promise coverage. She just said these are what the policies are. These are what the Donald policies are. Her first sentence says, we do cover Ellen Beard, which they did. They had their own policy for Ellen Beard. She also referenced the excess policy, not the Beards auto policy, where the UI coverage comes from, and talked about the fact that they have limits of a million dollars. I don't know how that could be an affirmation that you're entitled to coverage, not only under a policy we're not talking about, but an excess policy covering over that. And when you look to the terms of the excess policy, it specifically provides that we only provide insurance over the underlying scheduled policies, of which Ellen's policy was not a scheduled policy. People, if you just read the letter and don't go to the policy. Well, you know, no matter what, you're deemed to know the terms of your policy. That's another point which affects this whole reasonable reliance. Counsel, the insurance, they have the policies, and they can't sit there and ignore and stick their head in the sand and just rely on the fact of an acknowledgement letter saying you have limits of liability. You know, to suggest that coverage is absolute here. I went way off the way I planned to say, so. What about whether this is creating coverage, and whether it's not? Well, it's absolutely creating coverage, because there is no coverage for a vehicle that's not covered under the policy. In addition to the fact that she's not insured. So, it definitely falls within the scope of that rule, that waiver and estoppel cannot create coverage which does not otherwise exist. Oh, I can talk about one of the other new arguments in the reply brief that the UIM endorsement is ambiguous with respect to the exclusion for Ellen because she's driving her own vehicle based upon the other insurance clause. They argued that because there's another insurance clause that, well, this is other insurance, that should cancel each other out. There's no case law that provides that an exclusion doesn't apply because the policy contemplates the existence of other insurance. The other insurance situation would be applicable, for example, if Ellen or, not Ellen, either of the parents were, for example, riding or driving their neighbor's car or another family member's car, something like that. That's when the other insurance clause would trigger it in. It doesn't preclude, or it doesn't make. It doesn't bother exclusion G. It doesn't speak to exclusion G. I did have arguments on the fact that she did not purchase her policy. Basically, I think I covered everything. Any questions? Thank you very much. Thank you. Thank you. Thank you, Your Honors. Touch on a couple points here. I'll start with that last one about exclusion G and the other insurance. I know you were nodding your head, but I'm not sure I understand it then. Counsel stated the reason exclusion G applies is because Ellen has other insurance that's going to cover her for this loss. Now, in the policy, and I don't think they've disputed this, there are those other insurance clauses that specifically say, if you have other insurance, it's going to be, you're still covered, but it will be prorated out. I'm nodding because that is a standard clause of every insurance policy, because there can always be coverage somewhere else, and you always want to say how your coverage is going to fit into the coverage. If there's no coverage, because exclusion G excludes coverage for Ellen, for whatever reason, then there's no coverage. I just think that your reading of the other insurance provision would be surprising. The only point I make on that is that, as far as no case law, the case law is that if there's a contradiction in the policy, it's ambiguous. The contradiction is, on one hand, this exclusion specifically says that there's other insurance. Now, remember, the statute doesn't talk about other insurance. It talks about whether you're occupying a vehicle. Their language says, if there's other insurance, then there's no coverage. Then you go to the other insurance clause, and it says, if there's other insurance, there is coverage. It's a direct contradiction in their specific policy language. Because it's a contradiction, they're ambiguous, and we go to the one with more insurance in favor of coverage, etc. The second point that they talked about is that Ellen would not be covered under the liability section because it didn't involve the covered auto. I think that, and this is something I know we got into with Judge Gammarth, for example, Galarza, a pedestrian. Well, a pedestrian's not covered under the liability portion at that moment when they're a pedestrian, but they're covered under the underinsured. In Thousandth, I can never pronounce it, which are both Supreme Court cases, by the way, Thousandth and Merckx, they were a passenger in another car, or driving another car. That's not going to be covered under the liability at that moment, yet these people were still covered generally under the liability portion. So the point of UIM is that if you are an insured person generally under the liability portion, then you're entitled to the uninsured and underinsured motorist coverage. If it had to be at the specific moment, you could never get uninsured coverage for a pedestrian, or a bicyclist, or any of the other scenarios out there. The last point that they addressed is waiver and estoppel, and I think counsel put it correctly. She said, well, maybe it wasn't the most articulate way to write that letter. And, Your Honor, you said, well, when you're looking at this letter, that's what it says. It doesn't say what limits are. It uses the words, we provide coverage. Here are the limits. So they definitely were answering the straightforward question of what is the coverage with a straightforward answer. We provide coverage. Here are the limits. Counsel talked about, well, but then if you go to the policy, it's really not there. But the point of waiver and estoppel is that we don't have to show that it is or isn't included in the policy, because that's the point. They're waiving it, just like the other, like the Burke case, where it was a statute of limitations defense, and maybe they would have won, but they waived it. Or let's say a case where there was another defense in that case that he wasn't in the scope of his employment, but they waived it. So whether or not they win on the underlying issue, which we believe we still do with the residency argument, it doesn't matter what the policy says for waiver and estoppel. They told us there was a limit. We clearly relied on it reasonably. They did mention the eyes closed, and I think, Your Honor, hit on that. Well, counsel, the letter went to counsel, correct? Yes. Right. And so at that point, doesn't counsel then pull out the policy to see, you know, what the conditions are? You don't just assume, oh, I have this letter, there is a policy, so we're going to collect on this policy. Pull out the policy, look at the language, and see what the conditions are. There are always conditions, you know, to the coverage. And when you say the letter, you're not talking about the denial letter. You're talking about the letter where they said there's coverage.  Okay. So my opinion, as I stand here today, is that there's coverage. I wrote them to confirm the coverage. They responded there's coverage. I had already looked at the policy. She was clearly a resident living with her parents. She was a household driver on all the policies. She was a rated driver on the PELC. There was no question there was coverage. I wrote it. You didn't solely rely on their representation, as you saw in the letter. No, no, no. I reviewed the policies first. Then they confirmed it. Then I went and settled the underlying case for the $50,000 after getting their approval. And by the way, their approval to go ahead and accept the $50,000, they still never said anything about coverage. They said, you better take the $50,000 because we're not going to pay you. It was months later that they finally said it. So in conclusion, we believe, again, three separate reasons. One is clear residency. I don't think there's a dispute there. And then two is the waiver and estoppel both provide coverage either way you look at it. Thank you very much for your attention. Thank you to all of you. This was a surprisingly complicated case. And you all did a very good job briefing it, and we will take it under advice. Thank you. We're now going to recess.